FILED
CLERK, U.S. DISTRICT COURT

10/26/2023

CENTRAL DISTRICT OF CALIFORNIA
BY:            CD            DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>EDGAR JOEL MARTINEZ-REYES,<br>RAUL CONTRERAS,<br>OSCAR EDUARDO MAYORGA,<br>LUIS BELANDRIA-CONTRERAS,<br>GUILLERMO ZAMBRANO,<br>DIEGO ACOSTA OVALLE,<br>BERNARDO MAUBERIS,<br>VIDAL LICON-ROBLES,<br>LEOPOLDO BERNAL,<br>DANIEL GONZALEZ,<br>　aka "Rafael Arocho,"<br>VICTOR RODRIGUEZ-TRUJILLO,<br>JULIO ALEXANDER CABRERA,<br>JOSE ANTONIO PARDO, and<br>JIANDE ZHOU,<br><br>　　　　Defendants. | CR  2:23-cr-00524-SVW<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy to Aid and Abet the Distribution of Cocaine and Methamphetamine; 21 U.S.C. §§ 841(a)(1), (b)(1)(A): Possession with Intent to Distribute Cocaine and Methamphetamine; 18 U.S.C. § 1956(h): Conspiracy to Launder Monetary Instruments; 18 U.S.C. § 371: Conspiracy to Operate an Unlicensed Money Transmitting Business; 31 U.S.C. §§ 5313, 5324(a)(3), (d)(2): Structuring Transactions to Avoid a Reporting Requirement; 18 U.S.C. §§ 111(a)(1), (b): Assaulting a Federal Officer With a Deadly Weapon; 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C), 28 U.S.C. § 2461(c), 21 U.S.C. § 853, and 31 U.S.C. § 5317: Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A.  TRADE IN GOODS FROM CHINA WAS USED TO CIRCUMVENT THE
    RESTRICTIONS ON TAKING FUNDS OUT OF CHINA

1.  The People's Republic of China ("PRC") maintained its economic strength in part by imposing a closed system of investment on its citizens.  That is, individuals who live, work, or invest in the PRC were restricted from transferring more than the equivalent of $50,000 per year out of China.  Consequently, many individuals with holdings in China who wished to transfer assets greater than $50,000 in value to the United States sought alternative methods outside the conventional banking system to move their funds.  These informal value transfer systems ("IVTS") required the participation of brokers who buy and sell U.S. dollars in the United States.

2.  To transfer funds to the United States, an individual in China would contact a broker with dollars to sell in the United States.  The individual in China would then transfer the equivalent amount in Chinese currency (renminbi) to an account in China specified by the broker.  Once the broker received electronic confirmation that the amount in question had been moved to the specified account, the broker would arrange for the dollars in the United States to be released to the buyer or to a designated representative of the buyer.

3.  The seller of U.S. currency in the United States would obtain dollars in a variety of ways, including by accepting cash from individuals engaged in criminal activity that generated large amounts of bulk currency, such as drug trafficking.  The U.S. broker would charge a percentage commission as a fee to the owner of the criminal

proceeds to conceal the nature and source of the funds (also known as "laundering").

4.   The funds that were transferred in China to the broker were then used to pay for goods purchased by businesses and organizations in Mexico, Colombia, or elsewhere such as consumer goods or items needed to aid the drug trafficking organization to manufacture illegal drugs, for example, precursor chemicals, including fentanyl. Once the goods were sold, generating local currency (for example, Mexican pesos), the proceeds would be returned to the drug trafficking organization that provided the dollars in the United States.  In this way, the funds from China facilitated the laundering of drug trafficking proceeds from the United States to the source country, while at the same time providing United States dollars to the individual from China who initiated the transaction.



**Money Broker Network**

© *RegTech Consulting, LLC. 2020*

B.    FEDERAL REPORTING REQUIREMENTS AND "STRUCTURING"

     5.    Under relevant federal law, a "financial institution," as that term is defined in Title 31, United States Code, Section 5312(a)(2)(R), included a business operating as an informal money transfer system to facilitate the transfer of money domestically or internationally outside of the conventional financial institutions system.

     6.    Under federal law, whenever a financial institution, including a bank, received over $10,000 in currency in one transaction or two or more related transactions that occurred within one year, the financial institution was required to file a Currency Transaction Report ("CTR") no later than 15 days after the transaction over $10,000.

     7.    If the person who was depositing or withdrawing the currency did not want a CTR to be filed, they might try to evade that filing by either purchasing cashier's checks with the currency under the mistaken belief that such purchases need not be reported, or "structuring" their deposits by (a) making repeated deposits into one account under the $10,000 reporting threshold, or (b) making multiple deposits, each below $10,000 in value, at different times, at different bank locations, or into different accounts.

C.    LICENSING REQUIREMENTS FOR ANY PERSON WHO ENGAGES IN TRANSMITTING FUNDS AS A BUSINESS BY ANY MEANS, INCLUDING BY COURIER

     8.    Under federal law, Title 31, United States Code, Section 5330 required the registration as a money transmitting business by any person who engaged as a business in an informal money transfer system or any network of people who engaged as a business in

4

facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system with the United States Department of the Treasury, Financial Crimes Enforcement Network.

9. Under federal law, Title 31, Code of Federal Regulations, Section 1010.100(ff)(5)(i), a "money transmitter" was (1) a person that provided money transmission services by accepting currency, funds, or other items of value that substitute for currency from one person and transmitting that currency, funds or other items of value that substitute for currency to another location or person by any means, including through a financial institution, an electronic funds transfer network, or an informal value transfer system; or (2) any other person engaged in the transfer of funds. A "money transmitter" was required to be licensed by both federal and state law, and failure to register under either federal or state law was a federal offense under Title 18, United States Code, Section 1960.

10. Title 18, United States Code, Sections 1960(a) and (b) prohibited the operation of an unlicensed money transmitting business.

11. Title 18, United States Code, Section 1960(c) prohibited the transportation or transmission of funds that were known to have been derived from a criminal offense or were intended to be used to promote or support unlawful activity.

12. None of the defendants, EDGAR JOEL MARTINEZ-REYES, RAUL CONTRERAS, OSCAR EDUARDO MAYORGA, LUIS BELANDRIA-CONTRERAS, GUILLERMO ZAMBRANO, DIEGO ACOSTA OVALLE, BERNARDO MAUBERIS, VIDAL LICON-ROBLES, LEOPOLDO BERNAL, DANIEL GONZALEZ, also known as "Rafael Arocho," VICTOR RODRIGUEZ-TRUJILLO, JULIO ALEXANDER CABRERA, JOSE ANTONIO

1  PARDO, JIANDE ZHOU, nor any business owned by them, was licensed

2  under state or federal law regulations as a lawful money transmitter.

3  D.  <u>TRADE-BASED MONEY LAUNDERING</u>

4      13.  Trade-Based Money Laundering ("TBML") was a system of

5  informal value transfer that exploited legitimate businesses and

6  trade systems to launder the proceeds of illegal activity.  TBML in

7  the drug trafficking context operated as follows:

8          a.  Drug trafficking conducted within the United States

9  generated large quantities of U.S. currency ("drug trafficking

10 proceeds"), that had to be transferred in some manner to the true

11 owners of that currency, that is, the individuals in other countries

12 who were the sources of the illegal drugs.

13         b.  Drug traffickers and others who committed illegal acts

14 in the United States were aware that banks and other financial

15 institutions were required to file CTRs that included the name and

16 identification of the beneficial owner or owners of those funds for

17 any transaction in U.S. currency in excess of $10,000 and frequently

18 tried to evade these reporting requirements.

19         c.  In addition, drug traffickers were alert to the high

20 costs of using the conventional banking system, which could include

21 exchange fees when exchanging dollars for pesos and/or wire transfer

22 fees.

23         d.  In order to evade the high costs of transfer and the

24 government reporting that accompanied the deposit of large amounts of

25 currency into the legitimate banking system, drug traffickers sought

26 other methods of integrating the drug proceeds they accumulated in

27 U.S. currency into the legitimate financial system so that it could

28 be transferred to the true owners without detection.

            e.    Criminal actors such as drug traffickers typically employed brokers or "money consolidators" who each operated as an informal bank where drug traffickers could place their accumulated drug proceeds, typically at lower exchange rates and for lesser fees than those at legitimate financial institutions.

            f.    Brokers and money consolidators sought out businesses and individuals in other countries who purchased merchandise in the United States and needed U.S. dollars to pay for that merchandise.

            g.    The dollars were sold in the black market for pesos and used to pay the open invoices of the businesses and individuals who had purchased goods in the United States.

            h.    When the purchased goods were shipped to the country of the purchaser and sold, the proceeds of those sales were then relinquished to the owner of the drug proceeds in the country where the drugs originated, that is, the drug trafficker whose product generated the U.S. currency, thus enabling the drug trafficker to avoid the physical transfer of currency across the border and the accompanying risks of seizure and robbery.

        14.    These Introductory Allegations are incorporated into each count of this Indictment.

COUNT ONE

[21 U.S.C. § 846]

[DEFENDANTS MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS,

ZAMBRANO, OVALLE, MAUBERIS, LICON-ROBLES, GONZALEZ,

and RODRIGUEZ-TRUJILLO]

A.   OBJECT OF THE CONSPIRACY

Beginning in or about October 2019, and continuing until on or about October 26, 2023, in Los Angeles, Ventura, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants EDGAR JOEL MARTINEZ-REYES, RAUL CONTRERAS, OSCAR EDUARDO MAYORGA, LUIS BELANDRIA-CONTRERAS, GUILLERMO ZAMBRANO, DIEGO ACOSTA OVALLE, BERNARDO MAUBERIS, VIDAL LICON-ROBLES, DANIEL GONZALEZ, also known as "Rafael Arocho," and VICTOR RODRIGUEZ-TRUJILLO, and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to commit an offense against the United States, namely, to aid and abet the distribution of controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A) and Title 18, United States Code, Section 2(a).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

1.   Means By Which Defendants Assisted Sinaloa Cartel Drug Traffickers to Conceal Their Drug Proceeds

a.   Members and operatives of the Sinaloa Cartel, a drug trafficking organization based in Mexico, would export large quantities of cocaine, methamphetamine, heroin, and marijuana into the United States and distribute those controlled substances through co-conspirators to cities across the country where they would be sold in large and small quantities.  The sales of these controlled

8

substances would yield large amounts of drug trafficking proceeds in U.S. currency.  Concealment of the drug trafficking proceeds from scrutiny by government or banking authorities was crucial to the drug traffickers' ability to profit from their drug importation and distribution scheme and maintain the viability of the scheme itself.

b.  Defendants MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS, ZAMBRANO, OVALLE, MAUBERIS, LICON-ROBLES, and GONZALEZ, and co-conspirators, would serve Sinaloa Cartel associates by assisting them in concealing their drug trafficking proceeds and making the proceeds generated in the United States accessible to the Sinaloa Cartel owners in Mexico, Colombia, and elsewhere.

c.  Defendants MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS, ZAMBRANO, OVALLE, MAUBERIS, LICON-ROBLES, GONZALEZ, and RODRIGUEZ-TRUJILLO, co-conspirator Julio Alexander Cabrera, and other co-conspirators, would collect the drug trafficking proceeds belonging to the Sinaloa Cartel in the United States in the form of U.S. currency, count and package them, and deliver the U.S. currency to members of illegal money exchange and remitting organizations known and unknown to the Grand Jury.

d.  Sinaloa Cartel operatives would notify defendant MARTINEZ-REYES of the approximate amount of drug trafficking proceeds to be picked up and the location where the proceeds were to be picked up and supply a telephone number and/or a code to defendant MARTINEZ-REYES.  In turn, defendant MARTINEZ-REYES would either pick up the drug proceeds himself or would designate defendants CONTRERAS, BELANDRIA-CONTRERAS, or ZAMBRANO to pick up the drug trafficking proceeds at the time and place agreed upon and supply the designated

person with the code and/or telephone number of the contact who was to deliver the drug proceeds.

e.   Defendants MARTINEZ-REYES, CONTRERAS, BELANDRIA-CONTRERAS, ZAMBRANO, OVALLE, LICON-ROBLES, MAUBERIS, GONZALEZ, and RODRIGUEZ-TRUJILLO, and co-conspirator Cabrera, would either deliver the U.S. currency to locations or individuals specified by members of the Sinaloa Cartel, or make other arrangements to launder the drug trafficking proceeds by a variety of methods described herein.

f.   Defendants BELANDRIA-CONTRERAS and ZAMBRANO, and co-conspirators, would establish and maintain bank accounts in their own names and the names of businesses or other individuals in the United States for the purpose of integrating the drug trafficking proceeds into the legitimate banking system in the United States.

g.   Defendants MARTINEZ-REYES and CONTRERAS would either deliver the drug trafficking proceeds in cash to individuals who, needing U.S. currency, purchased those proceeds in exchange for deposits into bank accounts designated by the Sinaloa Cartel members who were the owners of the drug trafficking proceeds, or arrange for the proceeds to be deposited into bank accounts established for that purpose.

2.   <u>Means By Which Defendants Assisted Sinaloa Cartel Members to Integrate the Drug Proceeds into the Legitimate Banking System</u>

a.   In order to conceal the nature, source, location, and ownership of the drug trafficking proceeds generated in the United States, as well as to conceal the illegal drug trafficking scheme itself, and to move the drug proceeds beyond the reach of law enforcement, defendant MARTINEZ-REYES, and co-conspirators, would

arrange to purchase cryptocurrency that could easily be transferred to accounts held by the Sinaloa Cartel.

      b.    Defendants MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS, and ZAMBRANO, and co-conspirators, would deliver the drug trafficking proceeds to operators of an underground banking system operated by Chinese nationals in the United States and elsewhere for the purpose of supplying U.S. currency to Chinese money exchanges that were operating illegally for use by their underground banking customers in the United States.

      c.    Defendants BELANDRIA-CONTRERAS and ZAMBRANO, and co-conspirators, would structure deposits of U.S. currency that represented drug trafficking proceeds into bank accounts to avoid the federal reporting requirement.

      d.    Defendant MARTINEZ-REYES would deliver drug trafficking proceeds to co-conspirators for conversion of those proceeds to cryptocurrency.

      e.    Defendant MAUBERIS would collect drug trafficking proceeds from Sinaloa Cartel operatives in the United States, use them to purchase precious metals and gems on the black market in the United States, take those items to Mexico, and sell those items to legitimate businesses in Mexico for a profit that he would use to reimburse the true owners of the drug trafficking proceeds, that is, the Sinaloa Cartel members, for the drug trafficking proceeds, in U.S. currency he had been given to purchase material in the United States, less a commission of .5 to 1.5 percent of the amount he had received.

C. UNDERLINE OVERT ACTS

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants MARTINEZ-REYES, CONTRERAS, BELANDRIA-CONTRERAS, MAYORGA, ZAMBRANO, OVALLE, MAUBERIS, LICON-ROBLES, GONZALEZ, and RODRIGUEZ-TRUJILLO, and co-conspirators, committed the following overt acts, among others, within the Central District of California, and elsewhere:

1.  On January 26, 2021, at the parking lot of an office complex at 8060 Florence Avenue, Downey, California ("the office complex"), defendant ZAMBRANO changed the front and back license plates on his black 2014 Mercedes Benz to license plates that were not assigned to that car.

2.  On January 26, 2021, in Downey, California, after meeting with defendants MARTINEZ-REYES and BELANDRIA-CONTRERAS, defendant ZAMBRANO got into a 2010 silver Infiniti registered to defendant MARTINEZ-REYES ("the silver Infiniti") and drove to 7914 Florence Avenue, Downey, California, where defendant ZAMBRANO picked up a weighted white bag containing an unknown quantity of U.S. currency that represented drug trafficking proceeds from a co-conspirator and then drove back to the office complex where he delivered the white bag to defendant MARTINEZ-REYES.

3.  On January 26, 2021, in Downey, California, defendant BELANDRIA-CONTRERAS delivered a large leather backpack containing an unknown quantity of U.S. currency that represented drug trafficking proceeds to defendant MARTINEZ-REYES at the office complex.

4.  On January 26, 2021, at 7920 Florence Avenue, Downey, California, defendant ZAMBRANO, again driving the silver Infiniti, picked up a second white bag containing an unknown quantity of U.S.

currency that represented drug trafficking proceeds from a co-conspirator, and delivered the white bag to defendant MARTINEZ-REYES at the office complex.

5.   On January 26, 2021, at the office complex, defendant MARTINEZ-REYES gave a large white bag with the words "Happy Birthday" on the side containing $226,600 in U.S. currency that represented drug trafficking proceeds to a co-conspirator.

6.   On January 27, 2021, at Citibank ATMs in Downey and Long Beach, California, defendant BELANDRIA-CONTRERAS structured cash deposits into his bank accounts to avoid a reporting requirement by conducting 24 separate transactions to deposit a total of $15,960 in U.S. currency.

7.   On January 29, 2021, at a Citibank ATM in Long Beach, California, defendant ZAMBRANO structured cash deposits into his bank account to avoid a reporting requirement by conducting 15 separate transactions to deposit a total of $19,900 in U.S. currency.

8.   On March 23, 2021, in Fontana, California defendant CONTRERAS picked up a yellow plastic bag containing an unknown quantity of U.S. currency that represented drug trafficking proceeds from co-conspirator Leopoldo Bernal.

9.   On April 12, 2021, in Los Angeles, California, defendant OVALLE delivered an unknown quantity of U.S. currency that represented drug trafficking proceeds to defendant CONTRERAS.

10.   On April 21, 2021, defendants MARTINEZ-REYES and CONTRERAS delivered a Fruity Pebbles cereal box containing an unknown quantity of U.S. currency that later proved to be approximately $59,980 that represented drug trafficking proceeds to a residence used as a

collection point and count house to further money laundering activity located at 11108 Freer Street, Temple City, California.

11. On May 19, 2021, defendant OVALLE picked up approximately $183,030 in U.S. currency that represented drug trafficking proceeds from a co-conspirator.

12. On May 27, 2021, in Pasadena, California, defendant GONZALEZ intentionally smashed his car into the official government vehicle driven by United States Drug Enforcement Administration Task Force Officer S.G., who was then trying to detain defendant GONZALEZ as part of a drug trafficking investigation, in an attempt to obstruct the investigation and injure that task force officer.

13. On May 27, 2021, in Pasadena, California, defendant GONZALEZ possessed 46 individually-wrapped packages of U.S. currency totaling approximately $598,110 that represented drug trafficking proceeds, pictured below.



14.  On July 12, 2021, in Anaheim, California, defendant CONTRERAS picked up an unknown quantity of U.S. currency in a large black duffel bag that represented drug trafficking proceeds from a co-conspirator.

15.  On July 12, 2021, in Temple City, California, defendant CONTRERAS delivered an unknown quantity of U.S. currency that represented drug trafficking proceeds to a money stash house operated by an unlicensed money exchange business located at 11108 Freer Street.

16.  On July 21, 2021, in El Monte, California, defendant MAYORGA delivered an unknown quantity of U.S. currency that represented drug trafficking proceeds to defendant CONTRERAS.

17.  On July 29, 2021, in Los Angeles, California, defendant LICON-ROBLES delivered an unknown amount of U.S. currency that represented drug trafficking proceeds to defendant CONTRERAS.

18.  On August 5, 2021, in Temple City, California, defendant CONTRERAS delivered an unknown amount of U.S. currency that represented drug trafficking proceeds to 11108 Freer Street.

19.  On August 18, 2021, in Temple City, California, defendant CONTRERAS delivered an unknown amount of U.S. currency that represented drug trafficking proceeds to 11108 Freer Street.

20.  On August 24, 2021, in Baldwin Park, California, defendant MAYORGA delivered approximately $249,500 in U.S. currency that represented drug trafficking proceeds to defendant MAUBERIS.

21.  On September 14, 2021, in Colton, California, defendant MAYORGA delivered approximately $99,350 in U.S. currency that represented drug trafficking proceeds to a co-conspirator who was to deliver the funds to Mexico.

22. On December 3, 2021, in Los Angeles, California, defendant RODRIGUEZ-TRUJILLO picked up an unknown quantity of U.S. currency that represented drug trafficking proceeds from a co-conspirator.

23. On December 16, 2021, in Lynwood, California, defendant RODRIGUEZ-TRUJILLO possessed approximately $379,660 in U.S. currency that represented drug trafficking proceeds, pictured below.



24. On January 5, 2022, in Pomona, California, defendant MAYORGA possessed approximately $205,330 in U.S. currency that represented drug trafficking proceeds.

25. On February 17, 2022, in Commerce, California, defendant MARTINEZ-REYES delivered approximately $124,800 in U.S. currency that represented drug trafficking proceeds to a co-conspirator.

26. On May 11, 2022, in Arcadia, California, defendant MARTINEZ-REYES delivered an unknown amount of U.S. currency that represented drug trafficking proceeds to a co-conspirator.

27.  On October 18, 2022, in San Gabriel, California, co-conspirator Cabrera delivered an unknown quantity of U.S. currency that represented drug trafficking proceeds to a co-conspirator.

COUNT TWO

[18 U.S.C. § 1956(h)]

[DEFENDANTS MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS, ZAMBRANO, OVALLE, MAUBERIS, LICON-ROBLES, GONZALEZ, RODRIGUEZ-TRUJILLO, and CABRERA]

A.   OBJECT OF THE CONSPIRACY

Beginning in or about October 2019, and continuing until on or about October 26, 2023, in Los Angeles, Ventura, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants EDGAR JOEL MARTINEZ-REYES, RAUL CONTRERAS, OSCAR EDUARDO MAYORGA, LUIS BELANDRIA-CONTRERAS, GUILLERMO ZAMBRANO, DIEGO ACOSTA OVALLE, BERNARDO MAUBERIS, VIDAL LICON-ROBLES, DANIEL GONZALEZ, also known as "Rafael Arocho," VICTOR RODRIGUEZ-TRUJILLO, and JULIO ALEXANDER CABRERA, and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to commit an offense against the United States, namely:

To knowingly and intentionally conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of a specified unlawful activity, and which property was, in fact, the proceeds of a specified unlawful activity, that is, the unlawful distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

18

B.   <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE</u>
    <u>ACCOMPLISHED</u>

The object of the conspiracy was to be accomplished, in substance, by the Means alleged in Count One, Section B of this Indictment, which are re-alleged and incorporated by reference herein.

C.   <u>OVERT ACTS</u>

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS, ZAMBRANO, OVALLE, MAUBERIS, LICON-ROBLES, GONZALEZ, "RODRIGUEZ-TRUJILLO, and CABRERA committed the following overt acts, among others, within the Central District of California, and elsewhere:

The Overt Acts 1 through 27 alleged in Count One, Section C of this Indictment are re-alleged and incorporated by reference herein.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)(II)]

[DEFENDANT BERNAL]

On or about March 25, 2021, in San Bernardino County, within the Central District of California, defendant LEOPOLDO BERNAL knowingly and intentionally possessed with intent to distribute at least 500 grams, that is, approximately 4,000 grams, of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance.

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II)]

[DEFENDANT LICON-ROBLES]

On or about July 29, 2021, in Los Angeles County, within the Central District of California, defendant VIDAL EMILIO LICON-ROBLES knowingly and intentionally possessed with intent to distribute at least five kilograms, that is, approximately 30.1 kilograms, of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ZHOU]

On or about July 26, 2022, in Los Angeles County, within the Central District of California, defendant JIANDE ZHOU knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 7.189 kilograms, of methamphetamine, a Schedule II controlled substance.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II); 18 U.S.C. § 2(a)]

[DEFENDANTS CABRERA and PARDO]

On or about October 18, 2022, in Los Angeles County, within the Central District of California, defendants JULIO ALEXANDER CABRERA and JOSE ANTONIO PARDO, each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute at least five kilograms, that is, approximately 50.6 kilograms, of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance.

1                                     COUNT SEVEN

2                             [18 U.S.C. §§ 371, 1960]

3 [DEFENDANTS MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS,

4                       ZAMBRANO, OVALLE, and MAUBERIS]

5 A.   OBJECT OF THE CONSPIRACY

6       Beginning on a date unknown, but no later than January 2021, and

7 continuing to in or about October 2023, in Los Angeles, Ventura, and

8 San Bernardino Counties, within the Central District of California,

9 and elsewhere, defendants EDGAR JOEL MARTINEZ-REYES, RAUL CONTRERAS,

10 OSCAR EDUARDO MAYORGA, LUIS BELANDRIA-CONTRERAS, GUILLERMO ZAMBRANO,

11 DIEGO ACOSTA OVALLE, and BERNARDO MAUBERIS, and others known and

12 unknown to the Grand Jury, conspired and agreed with each other to

13 knowingly and intentionally conduct, control, manage, supervise,

14 direct, and own an unlicensed money transmitting business affecting

15 interstate and foreign commerce, which failed to comply with the

16 money transmitting business registration requirements under Section

17 5330 of Title 31, United States Code, and the regulations thereunder,

18 all in violation of Title 18, United States Code, Sections 1960(a)

19 and 1960(b)(1)(A),(B), and (C).

20 B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

21      ACCOMPLISHED

22       The object of the conspiracy was to be accomplished, in

23 substance, as follows:

24       The object of the conspiracy was to be accomplished, in

25 substance, by the Means alleged in Count One, Section B of this

26 Indictment which are re-alleged and incorporated by reference herein.

27

28

C.    <u>OVERT ACTS</u>

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants MARTINEZ-REYES, CONTRERAS, MAYORGA, BELANDRIA-CONTRERAS, ZAMBRANO, OVALLE, and MAUBERIS committed the following overt acts, among others, within the Central District of California, and elsewhere:

The Overt Acts 1 through 27 alleged in Count One, Section C of this Indictment are re-alleged and incorporated by reference herein.

COUNT EIGHT

[31 U.S.C. §§ 5324(a)(3), (d)(2); 18 U.S.C. § 2(b)]

[DEFENDANT BELANDRIA-CONTRERAS]

On or about January 27, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant LUIS BELANDRIA-CONTRERAS knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured, assisted in structuring, and willfully caused to be structured, the following ATM deposits to a Citibank account ending in -1658 with a domestic financial institution, namely, Citibank, and did so while violating another law of the United States, namely, Title 18, United States Code, Section 1956, and as part of a pattern of illegal activity involving more than $100,000 in a 12-month period:

///

| Location of Citibank ATM | Time | Amount of Cash Deposited |
|---|---|---|
| Downey, CA | 3:47 p.m. | $880 |
| Downey, CA | 3:48 p.m. | $680 |
| Downey, CA | 3:49 p.m. | $420 |
| Downey, CA | 3:50 p.m. | $820 |
| Downey, CA | 3:51 p.m. | $520 |
| Downey, CA | 3:51 p.m. | $640 |
| Downey, CA | 3:52 p.m. | $740 |
| Downey, CA | 3:53 p.m. | $400 |
| Downey, CA | 3:53 p.m. | $860 |
| Downey, CA | 3:54 p.m. | $840 |
| Downey, CA | 3:55 p.m. | $840 |
| Downey, CA | 3:56 p.m. | $320 |
| Long Beach, CA | 4:59 p.m. | $280 |
| Long Beach, CA | 4:59 p.m. | $780 |
| Long Beach, CA | 5:00 p.m. | $940 |
| Long Beach, CA | 5:01 p.m. | $900 |
| Long Beach, CA | 5:02 p.m. | $520 |
| Long Beach, CA | 5:02 p.m. | $580 |
| Long Beach, CA | 5:03 p.m. | $720 |
| Long Beach, CA | 5:04 p.m. | $520 |
| Long Beach, CA | 5:04 p.m. | $760 |
| Long Beach, CA | 5:05 p.m. | $820 |
| Long Beach, CA | 5:06 p.m. | $580 |
| Long Beach, CA | 5:06 p.m. | $600 |

**Total transactions: 24**
**Total amount deposited: $15,960**

COUNT NINE

[31 U.S.C. §§ 5324(a)(3), (d)(2); 18 U.S.C. § 2(b)]

[DEFENDANT ZAMBRANO]

On or about January 29, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant GUILLERMO ZAMBRANO knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured, assisted in structuring, and willfully caused to be structured, the following ATM deposits to a Citibank account ending in -0057 with a domestic financial institution, namely, Citibank, and did so while violating another law of the United States, namely, Title 18, United States Code, Section 1956, and as part of a pattern of illegal activity involving more than $100,000 in a 12-month period:

| Location of Citibank ATM | Time | Amount of Cash Deposited |
| --- | --- | --- |
| Long Beach, CA | 11:39 a.m. | $3,500 |
| Long Beach, CA | 11:40 a.m. | $2,300 |
| Long Beach, CA | 11:41 a.m. | $4,100 |
| Long Beach, CA | 11:42 a.m. | $780 |
| Long Beach, CA | 11:42 a.m. | $820 |
| Long Beach, CA | 11:43 a.m. | $860 |
| Long Beach, CA | 11:44 a.m. | $820 |
| Long Beach, CA | 11:45 a.m. | $880 |
| Long Beach, CA | 11:46 a.m. | $940 |
| Long Beach, CA | 11:47 a.m. | $880 |
| Long Beach, CA | 11:48 a.m. | $940 |
| Long Beach, CA | 11:50 a.m. | $800 |
| Long Beach, CA | 11:51 a.m. | $700 |
| Long Beach, CA | 11:51 a.m. | $720 |
| Long Beach, CA | 11:52 a.m. | $860 |

**Total transactions: 15**
**Total amount deposited: $19,900**

COUNT TEN

[18 U.S.C. § 111(a)(1), (b)]

[DEFENDANT GONZALEZ]

On or about May 27, 2021, in Los Angeles County, within the Central District of California, defendant DANIEL GONZALEZ, also known as "Rafael Arocho," intentionally and forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with United States Drug Enforcement Administration Task Force Officer S.G., while S.G. was engaged in, and on the account of, the performance of his official federal duties, and in so doing, used a deadly and dangerous weapon, namely, a 2013 Lexus ES350 car.



1                    FORFEITURE ALLEGATION ONE

2                       [21 U.S.C. § 853]

3       1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 21,

6  United States Code, Section 853 and Title 28, United States Code,

7  Section 2461(c), in the event of any defendant's conviction of the

8  offenses set forth in any of Counts One and Three through Six of this

9  Indictment.

10      2.    Any defendant so convicted, shall forfeit to the United

11 States of America the following:

12           (a)  All right, title and interest in any and all property,

13 real or personal, constituting or derived from, any proceeds which

14 said defendant obtained, directly or indirectly, from any such

15 offense;

16           (b)  All right, title and interest in any and all property,

17 real or personal, used, or intended to be used, in any manner or

18 part, to commit, or to facilitate the commission of any such offense;

19 and

20           (c)  To the extent such property is not available for

21 forfeiture, a sum of money equal to the total value of the property

22 described in subparagraphs (a) and (b).

23      3.    Pursuant to Title 21, United States Code, Section 853(p),

24 any defendant so convicted shall forfeit substitute property if, by

25 any act or omission of said defendant, the property described in the

26 preceding paragraph, or any portion thereof: (a) cannot be located

27 upon the exercise of due diligence; (b) has been transferred, sold

28 to, or deposited with a third party; (c) has been placed beyond the

jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction of the offenses set forth in either of Counts Two or Seven of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the

course of the money laundering offense unless the defendant, in
committing the offense or offenses giving rise to the forfeiture,
conducted three or more separate transactions involving a total of
$100,000.00 or more in any twelve-month period.

1                          FORFEITURE ALLEGATION THREE

2              [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3        1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 981(a)(1)(C) and Title 28, United States

7   Code, Section 2461(c), in the event of any defendant's conviction of

8   the offense set forth in Count Seven of this Indictment.

9        2.    Any defendant so convicted shall forfeit to the United

10  States of America the following:

11            (a)   all right, title, and interest in any and all

12  property, real or personal, constituting, or derived from, any

13  proceeds traceable to the offense; and

14            (b)   To the extent such property is not available for

15  forfeiture, a sum of money equal to the total value of the property

16  described in subparagraph (a).

17       3.    Pursuant to Title 21, United States Code, Section 853(p),

18  as incorporated by Title 28, United States Code, Section 2461(c), any

19  defendant so convicted shall forfeit substitute property, up to the

20  value of the property described in the preceding paragraph if, as the

21  result of any act or omission of said defendant, the property

22  described in the preceding paragraph or any portion thereof (a)

23  cannot be located upon the exercise of due diligence; (b) has been

24  transferred, sold to, or deposited with a third party; (c) has been

25  placed beyond the jurisdiction of the court; (d) has been

26  substantially diminished in value; or (e) has been commingled with

27  other property that cannot be divided without difficulty.

28

1                          FORFEITURE ALLEGATION FOUR

2                          [31 U.S.C. § 5317]

3      1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4 Procedure, notice is hereby given that the United States of America

5 will seek forfeiture as part of any sentence, pursuant to Title 31,

6 United States Code, Section 5317, in the event of any defendant's

7 conviction of the offenses set forth in either of Counts Eight or

8 Nine of this Indictment.

9      2.   Any defendant so convicted shall forfeit to the United

10 States of America the following:

11         (a)   All property, real or personal, involved in the

12 offense and any property traceable thereto; and

13         (b)   To the extent that such property is not available for

14 forfeiture, a sum of money equal to the total value of the property

15 described in subparagraph (a).

16      3.   Pursuant to Title 21, United States Code, Section 853(p), as

17 incorporated by Title 31, United States Code, Section 5317(c)(1)(B),

18 any defendant so convicted shall forfeit substitute property, if, by

19 any act or omission of said defendant, the property described in the

20 preceding, or any portion thereof; (a) cannot be located upon the

21 exercise of due diligence; (b) has been transferred, sold to, or

22 deposited with a third party; (c) has been placed beyond the

23 jurisdiction of the court; (d) has been substantially diminished in

24 //

25 //

26 //

27

28

value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/s/

_____
Foreperson

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

J. MARK CHILDS
Assistant United States Attorney
Chief, International Narcotics,
Money Laundering, and
Racketeering Section

BENEDETTO L. BALDING
Assistant United States Attorney
Deputy Chief, International
Narcotics, Money Laundering, and
Racketeering Section

JULIE J. SHEMITZ
Assistant United States Attorney
International Narcotics, Money
Laundering, and Racketeering
Section

3