```
                                              FILED
                                   CLERK, U.S. DISTRICT COURT

                                      4/4/2024

                                  CENTRAL DISTRICT OF CALIFORNIA
                                  BY:         CDO        DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>EDGAR JOEL MARTINEZ-REYES,<br>PEIJI TONG,<br> aka "PJ,"<br> aka "Dr. P,"<br> aka "Po,"<br>SAI ZHANG,<br> aka "Tommy,"<br>CHENGWU HE,<br> aka "Ocean,"<br>BERNARDO MAUBERIS,<br>PANYU ZHAO,<br>RAUL CONTRERAS,<br> aka "Batman,"<br>GUILLERMO ZAMBRANO,<br>LUIS BELANDRIA-CONTRERAS,<br>HANG SU,<br>JIAYONG YU,<br> aka "Haoran Feng,"<br>XIAOLEI YE,<br>XUANYI MU,<br>SHOU YANG,<br> aka "Chaoming Cheng,"<br>OSCAR EDUARDO MAYORGA,<br>DIEGO ACOSTA OVALLE,<br>VICTOR RODRIGUEZ-TRUJILLO,<br>JIAXUAN HE,<br> aka "Edward,"<br>VIDAL LICON-ROBLES,<br>LEOPOLDO BERNAL, | No.  2:23-cr-524(A)-DMG<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy to<br>Aid and Abet the Distribution of<br>Cocaine and Methamphetamine; 21<br>U.S.C. §§ 841(a)(1), (b)(1)(A):<br>Possession with Intent to<br>Distribute Cocaine and<br>Methamphetamine; 18 U.S.C.<br>§ 1956(h): Conspiracy to Launder<br>Monetary Instruments; 18 U.S.C.<br>§ 371: Conspiracy to Operate an<br>Unlicensed Money Transmitting<br>Business; 31 U.S.C. §§ 5313,<br>5324(a)(3), (d)(2): Structuring<br>Transactions to Avoid a Reporting<br>Requirement; 18 U.S.C.<br>§§ 111(a)(1), (b): Assaulting a<br>Federal Officer With a Deadly<br>Weapon; 18 U.S.C. § 981(a)(1)(C),<br>18 U.S.C. § 982(a)(1), 21 U.S.C.<br>§ 853, 28 U.S.C. § 2461(c), and 31<br>U.S.C. § 5317: Criminal<br>Forfeiture] |

DANIEL GONZALEZ,
    aka "Rafael Arocho,"
JULIO ALEXANDER CABRERA,
JOSE ANTONIO PARDO, and
JIANDE ZHOU,

        Defendants.

The Grand Jury charges:

                    INTRODUCTORY ALLEGATIONS

At times relevant to this First Superseding Indictment:

A.   MONEY LAUNDERING ORGANIZATIONS FUEL THE DRUG TRADE IN THE UNITED
     STATES AND CONTRIBUTE TO THE EPIDEMIC OF ADDICTION BY PROVIDING
     A VITAL SERVICE TO DRUG DISTRIBUTION ORGANIZATIONS

     1.  Drug Trafficking Organizations ("DTOs") distribute cocaine, methamphetamine, heroin, and fentanyl (as pictured below) sourced from manufacturers in Mexico and elsewhere throughout the United States, fueling the epidemic of addiction and overdose deaths facing the nation.  For instance, fentanyl is the single deadliest drug threat that the United States has ever encountered.





2.   Individuals purchasing drugs for personal use at the retail level generally pay for these drugs using U.S. currency, thus generating huge quantities of cash in cities across the country that belongs to the DTOs, including the Sinaloa Cartel.  The Sinaloa Cartel, based in the Mexican state of Sinaloa, operates in countries around the world and is one of the dominant drug trafficking organizations in the Western Hemisphere.  The Sinaloa Cartel is largely responsible for the massive influx of fentanyl into the United States over the past approximately eight years, and for the accompanying violence and deaths that have afflicted communities on both sides of the border.

3.   The illegal drug trade generates illicit cash profits in the United States that needs to be repatriated to the DTOs in Latin America for the DTOs to continue operating profitably.  However, because the drug-related proceeds are the product of unlawful activity, the repatriation must avoid law enforcement detection.  As a result, DTOs find it difficult to move drug-related cash using traditional banking systems.  To transfer this cash to Latin America, DTOs employ money laundering organizations ("MLOs") to assist them in transmitting the funds, concealing the source and true ownership of

1    the money, and enabling the DTOs to continue and expand their

2    operations.

3        4.   DTOs have increasingly partnered with China-based MLOs to

4    take advantage of the large demand for U.S. dollars in China.  The

5    Chinese MLOs use complex, sophisticated techniques to address DTOs'

6    need to collect and remit bulk cash from the sale of drugs in the

7    United States to the DTO leadership in Latin America.

8        5.   To initiate the Chinese money laundering cycle, DTOs

9    contract with Chinese MLOs for the pick-up and remittance of cash

10   from the sale of narcotics such as fentanyl, methamphetamine, and

11   cocaine to U.S. consumers by local organized criminal enterprises.

12   Once the DTO and the MLO have confirmed that the drug-related cash

13   changed hands in the United States, the Chinese MLO releases

14   equivalent funds (minus a fee) to the DTO in a previously agreed

15   manner.

16       6.   In recent years, there has been an explosion of illegal

17   money exchange businesses run primarily by Chinese nationals in the

18   United States, that are able to accept enormous amounts of United

19   States currency from their DTO customers and complete the money

20   laundering cycle for a small fee (0.5% to 2% of the amount being

21   transferred), in contrast to traditional money laundering methods for

22   which the MLOs typically charged much higher rates of 5% to 10% or

23   more.

24   B.   TRADITIONAL TRADE-BASED MONEY LAUNDERING AND CHINESE UNDERGROUND

25        BANKING

26       7.   Trade-Based Money Laundering

27            a.   Trade-Based Money Laundering ("TBML") is a system of

28   informal value transfer that exploits legitimate businesses and trade

4

systems to launder the proceeds of illegal activity. TBML in the drug trafficking context operates as follows:

b.    Drug trafficking conducted within the United States generates large quantities of U.S. currency ("drug trafficking proceeds"), that must be transferred in some manner to the true owners of that currency, that is, the individuals in other countries who are the sources of the illegal drugs.

c.    Drug traffickers and others who commit illegal acts in the United States are aware that banks and other financial institutions are required to file Currency Transaction Reports ("CTRs") with the Financial Crimes Enforcement Network ("FinCEN") of the United States Department of the Treasury that include the name and identification of the beneficial owner or owners of those funds for any transaction in U.S. currency in excess of $10,000, and frequently try to evade these reporting requirements.

d.    In addition, drug traffickers are alert to the high costs of using the conventional banking system, which could include exchange fees when exchanging dollars for pesos and/or wire transfer fees.

e.    In order to evade the high costs of transfer and the government reporting that accompanies the deposit of large amounts of currency into the legitimate banking system, drug traffickers seek other methods of integrating the drug trafficking proceeds they accumulate in U.S. currency into the legitimate financial system so that it can be transferred to the true owners without detection.

f.    Criminal actors such as drug traffickers typically employ brokers or "money consolidators" who each operate as an informal bank where drug traffickers can place their accumulated drug

trafficking proceeds, typically at lower exchange rates and for lesser fees than those at legitimate financial institutions.

g.    Brokers and money consolidators seek out businesses and individuals in other countries who purchase merchandise in the United States and need U.S. dollars to pay for that merchandise.

h.    The dollars are sold in the black market for pesos and used to pay the open invoices of the businesses and individuals who have purchased goods in the United States.

i.    When the purchased goods are shipped to the country of the purchaser and sold, the proceeds of those sales are then relinquished to the owner of the drug trafficking proceeds in the country where the drugs originated, that is, the drug trafficker whose product generated the U.S. currency, thus enabling the drug trafficker to avoid the physical transfer of currency across the border and the accompanying risks of law enforcement seizure and robbery.

8.    <u>Trade in Goods from China Used to Circumvent Restrictions on Taking Funds Out of China</u>

a.    The People's Republic of China ("PRC") maintains its economic strength in part by imposing a closed system of investment on its citizens. That is, individuals who live, work, or invest in the PRC are generally restricted from transferring more than the equivalent of $50,000 per year out of China. Consequently, many individuals with holdings in China who wish to transfer assets greater than $50,000 in value to the United States seek alternative methods outside the conventional banking system to move their funds. These informal value transfer systems ("IVTS") require the

participation of brokers who buy and sell U.S. dollars in the United States.

b.   To transfer funds to the United States, an individual in China contacts a broker with dollars to sell in the United States. The individual in China then transfers the equivalent amount in Chinese currency (renminbi) to an account in China specified by the broker. Once the broker receives electronic confirmation that the amount in question has been moved to the specified account, the broker arranges for the dollars in the United States to be released to the buyer or to a designated representative of the buyer.

c.   The seller of U.S. currency in the United States obtains dollars in a variety of ways, including by accepting cash from individuals engaged in criminal activity that generates large amounts of bulk currency, such as drug trafficking.  The U.S. broker charges a percentage commission as a fee to the owner of the criminal proceeds to conceal the nature and source of the funds.

d.   The funds that are transferred in China to the broker are then used to pay for goods purchased by businesses and organizations in Mexico, Colombia, or elsewhere such as consumer goods or items needed to aid the drug trafficking organization to manufacture illegal drugs, for example, precursor chemicals, including fentanyl. Once the goods are sold, generating local currency (for example, Mexican pesos), the proceeds are returned to the drug trafficking organization that provided the dollars in the United States. In this way, the funds from China facilitate the laundering of drug trafficking proceeds from the United States to the source country, while at the same time providing United States

1  dollars to the individual from China who initiated the transaction.
2  This system is depicted in the below diagram.



**Money Broker Network**

© *RegTech Consulting, LLC. 2020*

17          e.    Because of the many Chinese nationals living in the
18  United States who use this method of transferring their funds from
19  China to the United States, there is a very high demand for United
20  States currency from the Chinese money exchange businesses described
21  above; that demand can easily be met by the DTOs that have drug
22  trafficking proceeds they wish to transform into usable funds
23  available in the traditional banking system.
24          f.    The Chinese money exchange businesses actively solicit
25  and accept drug trafficking proceeds from the DTOs by charging a
26  reduced rate for laundering those proceeds, thereby assisting the
27  DTOs to repatriate their profits, and continue the business of
28  supplying deadly drugs to the United States and other countries.

g.   The Chinese money exchange businesses dispose of the drug proceeds by either delivering United States currency directly to their money exchange customers, purchasing real or personal property, including luxury goods and cars to be shipped to China, or using a variety of traditional methods to place the funds into the traditional banking system such as purchasing cashier's checks, or "structuring," that is, depositing small amounts at a time into bank accounts opened for this purpose.

C.   FEDERAL REPORTING REQUIREMENTS AND "STRUCTURING"

9.   Under relevant federal law, a "financial institution," as that term is defined in Title 31, United States Code, Section 5312(a)(2)(R), includes a business operating as an informal money transfer system to facilitate the transfer of money domestically or internationally outside of the conventional financial institutions system.

10.   Under federal law, whenever a financial institution, including a bank, receives over $10,000 in currency in one transaction or two or more related transactions that occurred within one year, the financial institution is required to file a CTR no later than 15 days after the transaction exceeding $10,000.

11.   If the person who deposits or withdraws the currency does not want a CTR to be filed, they might try to evade that filing by either purchasing cashier's checks with the currency under the mistaken belief that such purchases need not be reported, or "structuring" their deposits by (a) making repeated deposits into one account under the $10,000 reporting threshold, or (b) making multiple deposits, each below $10,000 in value, at different times, at different bank locations, or into different accounts.

D.   LICENSING REQUIREMENTS FOR ANY PERSON WHO ENGAGES IN
     TRANSMITTING FUNDS AS A BUSINESS BY ANY MEANS, INCLUDING BY
     COURIER

     12.   Under federal law, Title 31, United States Code, Section
5330 requires the registration as a money transmitting business by
any person who engages as a business in an informal money transfer
system or any network of people who engages as a business in
facilitating the transfer of money domestically or internationally
outside of the conventional financial institutions system with
FinCEN.

     13.   Under federal law, Title 31, Code of Federal Regulations,
Section 1010.100(ff)(5)(i), a "money transmitter" is (1) a person who
provides money transmission services by accepting currency, funds, or
other items of value that substitute for currency from one person and
transmitting that currency, funds or other items of value that
substitute for currency to another location or person by any means,
including through a financial institution, an electronic funds
transfer network, or an informal value transfer system; or (2) any
other person engaged in the transfer of funds.  A "money transmitter"
is required to be licensed by both federal and state law, and failure
to register under either federal or state law is a federal offense
under Title 18, United States Code, Section 1960.

     14.   Title 18, United States Code, Sections 1960(a) and (b)
prohibit the operation of an unlicensed money transmitting business.

     15.   Title 18, United States Code, Section 1960(b)(1)(C)
prohibits the transportation or transmission of funds that are known
to have been derived from a criminal offense or are intended to be
used to promote or support unlawful activity.

10

16.   None of the defendants, EDGAR JOEL MARTINEZ-REYES, PEIJI TONG, also known as ("aka") "PJ," aka "Dr. P," aka "Po," SAI ZHANG, aka "Tommy," CHENGWU HE, aka "Ocean," BERNARDO MAUBERIS, PANYU ZHAO, RAUL CONTRERAS, aka "Batman," GUILLERMO ZAMBRANO, LUIS BELANDRIA-CONTRERAS, HANG SU, JIAYONG YU, aka "Haoran Feng," XIAOLEI YE, XUANYI MU, SHOU YANG, aka "Chaoming Cheng," OSCAR EDUARDO MAYORGA, DIEGO ACOSTA OVALLE, VICTOR RODRIGUEZ-TRUJILLO, JIAXUAN HE, aka "Edward," VIDAL LICON-ROBLES, LEOPOLDO BERNAL, DANIEL GONZALEZ, aka "Rafael Arocho," JULIO ALEXANDER CABRERA, JOSE ANTONIO PARDO, and JIANDE ZHOU, nor any business owned by them, is licensed under state or federal law and regulations as a lawful money transmitter.

17.   These Introductory Allegations are incorporated into each count of this First Superseding Indictment.

1                              COUNT ONE

2                          [21 U.S.C. § 846]

3                          [ALL DEFENDANTS]

4    A.   OBJECT OF THE CONSPIRACY

5         Beginning in or about October 2019, and continuing until on or

6    about October 26, 2023, in Los Angeles, Ventura, and San Bernardino

7    Counties, within the Central District of California, and elsewhere,

8    defendants EDGAR JOEL MARTINEZ-REYES, PEIJI TONG, also known as

9    ("aka") "PJ," aka "Dr. P," aka "Po," SAI ZHANG, aka "Tommy," CHENGWU

10   HE, aka "Ocean," BERNARDO MAUBERIS, PANYU ZHAO, RAUL CONTRERAS, aka

11   "Batman," GUILLERMO ZAMBRANO, LUIS BELANDRIA-CONTRERAS, HANG SU,

12   JIAYONG YU, aka "Haoran Feng," XIAOLEI YE, XUANYI MU, SHOU YANG, aka

13   "Chaoming Cheng," OSCAR EDUARDO MAYORGA, DIEGO ACOSTA OVALLE, VICTOR

14   RODRIGUEZ-TRUJILLO, JIAXUAN HE, aka "Edward," VIDAL LICON-ROBLES,

15   LEOPOLDO BERNAL, DANIEL GONZALEZ, aka "Rafael Arocho," JULIO

16   ALEXANDER CABRERA, JOSE ANTONIO PARDO, and JIANDE ZHOU, and others

17   known and unknown to the Grand Jury, conspired and agreed with each

18   other to commit an offense against the United States, namely, to

19   knowingly and intentionally aid and abet the distribution of

20   controlled substances, in violation of Title 21, United States Code,

21   Sections 846 and 841(a)(1), (b)(1)(A) and Title 18, United States

22   Code, Section 2(a).

23   B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

24        ACCOMPLISHED

25        1.   Means By Which Defendants Assisted Sinaloa Cartel Drug
                  Traffickers to Conceal Their Drug Proceeds
26

27        a.   Members and operatives of the Sinaloa Cartel, a drug

28   trafficking organization based in Mexico, would import large

                                  12

quantities of cocaine, methamphetamine, heroin, fentanyl, and marijuana into the United States and distribute those controlled substances through co-conspirators to cities across the country where they would be sold in large and small quantities.  The sales of these controlled substances would yield huge sums of drug trafficking proceeds in U.S. currency.  Concealment of the drug trafficking proceeds from scrutiny by government or banking authorities was crucial to the drug traffickers' ability to profit from their drug importation and distribution scheme and maintain the viability of the scheme itself.

b.    Defendants MARTINEZ-REYES, TONG, SAI ZHANG, CHENGWU HE, MAUBERIS, ZHAO, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, SU, YU, YE, MU, YANG, MAYORGA, OVALLE, RODRIGUEZ-TRUJILLO, JIAXUAN HE, LICON-ROBLES, BERNAL, GONZALEZ, CABRERA, PARDO, and ZHOU, and co-conspirators, would serve Sinaloa Cartel associates by assisting them in concealing their drug trafficking proceeds and making the proceeds generated in the United States accessible to the Sinaloa Cartel owners in Mexico, Colombia, and elsewhere.

c.    Defendants MARTINEZ-REYES and TONG would travel to Mexico to meet with members of the Sinaloa Cartel in order to obtain contracts to launder drug trafficking proceeds in the United States in exchange for a commission fee that was a percentage of the amount laundered.  A photograph of MARTINEZ-REYES and TONG entering the United States together from Mexico on January 10, 2021 is below.



d.    Defendants LICON-ROBLES, BERNAL, GONZALEZ, and ZHOU would distribute illegal drugs including cocaine and methamphetamine, obtained from associates of the Sinaloa Cartel and collect the proceeds from those transactions in order to pay back their suppliers.

e.    Defendants MARTINEZ-REYES, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, MAYORGA, OVALLE, RODRIGUEZ-TRUJILLO, GONZALEZ, CABRERA, and PARDO, and co-conspirators, would receive the drug trafficking proceeds belonging to the Sinaloa Cartel in the United States in the form of U.S. currency, count and package them, and deliver the U.S. currency to members of illegal money exchange and remitting organizations including defendants TONG, SAI ZHANG, CHENGWU HE, PANYU ZHAO, SU, YU, YE, MU, YANG, and JIAXUAN HE, and others known and unknown to the Grand Jury to be laundered for a fee.

f.    Sinaloa Cartel operatives would notify MARTINEZ-REYES, TONG, SAI ZHANG, CHENGWU HE, MAUBERIS, ZHAO, CONTRERAS, ZAMBRANO, MAYORGA, OVALLE, RODRIGUEZ-TRUJILLO, LICON-ROBLES, BERNAL, GONZALEZ,

or CABRERA of the approximate amount of drug trafficking proceeds to be picked up and the location where the proceeds were to be picked up and supply a telephone number and/or a code to be used to identify the couriers to one another.

       g.   Defendants MARTINEZ-REYES, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, MAYORGA, OVALLE, RODRIGUEZ-TRUJILLO, CABRERA, and PARDO, and co-conspirators, would either deliver the U.S. currency to locations or individuals specified by members of the Sinaloa Cartel, or make other arrangements to launder the drug trafficking proceeds by a variety of methods described herein.

       h.   Defendants CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, SU, YU, YE, MU, YANG, and JIAXUAN HE, and co-conspirators, would establish and maintain bank accounts in their own names, including aliases, and the names of businesses or other individuals in the United States for the purpose of integrating the drug trafficking proceeds into the legitimate banking system in the United States.

       i.   Defendants TONG, SAI ZHANG, CHENGWU HE, ZHAO, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, SU, YU, YE, MU, YANG, MAYORGA, OVALLE, JIAXUAN HE, and ZHOU and co-conspirators would either deliver the drug trafficking proceeds in cash to individuals who, needing U.S. currency, purchased those proceeds in exchange for deposits into bank accounts designated by the Sinaloa Cartel members who were the owners of the drug trafficking proceeds, purchase cryptocurrency, or arrange for the proceeds to be deposited into bank accounts established for that purpose.

2.   <u>Means By Which Defendants Assisted Sinaloa Cartel Members to Integrate the Drug Proceeds into the Legitimate Banking System</u>

a.   In order to conceal the nature, source, location, and ownership of the drug trafficking proceeds generated in the United States, as well as to conceal the illegal drug trafficking scheme itself, and to move the drug proceeds beyond the reach of law enforcement, defendants MARTINEZ-REYES, TONG, SAI ZHANG, and ZHAO, and co-conspirators, would arrange to purchase cryptocurrency that could easily and rapidly be transferred to accounts held by the Sinaloa Cartel.

b.   Defendants MARTINEZ-REYES, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, and MAYORGA, and co-conspirators, would deliver the drug trafficking proceeds to operators of an underground banking system including defendants TONG, SAI ZHANG, ZHAO, and CHENGWU HE, and co-conspirators for the purpose of supplying U.S. currency to Chinese underground banking customers in the United States.

c.   Defendants ZAMBRANO and BELANDRIA-CONTRERAS, and co-conspirators, would structure deposits of U.S. currency that represented drug trafficking proceeds into bank accounts to avoid the federal reporting requirement.

d.   Defendant MAUBERIS would collect drug trafficking proceeds from Sinaloa Cartel operatives in the United States, use them to purchase precious metals and gems on the black market in the United States, take those items to Mexico, and sell those items to legitimate businesses in Mexico for a profit that he would use to reimburse the true owners of the drug trafficking proceeds, that is, the Sinaloa Cartel members, for the drug trafficking proceeds, in U.S. currency he had been given to purchase material in the United

States, less a commission of .5 percent to 1.5 percent of the amount he had received.

C.   OVERT ACTS

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants MARTINEZ-REYES, TONG, SAI ZHANG, CHENGWU HE, MAUBERIS, ZHAO, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, SU, YU, YE, MU, YANG, MAYORGA, OVALLE, RODRIGUEZ-TRUJILLO, JIAXUAN HE, LICON-ROBLES, BERNAL, GONZALEZ, CABRERA, PARDO, and ZHOU, and co-conspirators, committed the following overt acts, among others, within the Central District of California, and elsewhere, including but not limited to, the following:

1.   On January 16, 2020, in Bell Gardens, California, defendant CHENGWU HE delivered an unknown sum of drug trafficking proceeds in U.S. currency to an unknown male, who was a money exchange customer, at the Bicycle Casino.

2.   On January 16, 2020, in Monterey Park, California, defendant CHENGWU HE possessed approximately $55,286 of drug trafficking proceeds in United States currency.

3.   On September 4, 2020, in Arcadia, California, defendants MU and SU, at the direction of defendant SAI ZHANG, accepted delivery of $34,000 of drug trafficking proceeds, wrapped in aluminum foil inside an orange bag, from a female drug proceeds courier known to the Grand Jury.

4.   On January 26, 2021, at a parking lot of an office complex located at 8060 Florence Avenue, Downey, California ("the office complex"), defendant ZAMBRANO changed the front and back license

plates on his black 2014 Mercedes Benz to license plates that were not assigned to that car.

5.   On January 26, 2021, in Downey, California, after meeting with defendants MARTINEZ-REYES and BELANDRIA-CONTRERAS, defendant ZAMBRANO got into a 2010 silver Infiniti registered to defendant MARTINEZ-REYES ("the silver Infiniti") and drove to 7914 Florence Avenue, Downey, California, where defendant ZAMBRANO picked up a weighted white bag containing an unknown quantity of drug trafficking proceeds in U.S. currency from a co-conspirator and then drove back to the office complex where he delivered the white bag to defendant MARTINEZ-REYES.

6.   On January 26, 2021, in Downey, California, defendant BELANDRIA-CONTRERAS delivered a large leather backpack containing an unknown quantity of drug trafficking proceeds in U.S. currency to defendant MARTINEZ-REYES at the office complex.

7.   On January 26, 2021, at 7920 Florence Avenue, Downey, California, defendant ZAMBRANO, again driving the silver Infiniti, picked up a second white bag containing an unknown quantity of drug trafficking proceeds in U.S. currency from a co-conspirator, and delivered the white bag to defendant MARTINEZ-REYES at the office complex.

8.   On January 26, 2021, in Downey, California, in an electronic communication using coded language, defendant TONG instructed defendant JIAXUAN HE to pick up approximately $226,600 of drug trafficking proceeds in U.S. currency at the office complex.

9.   On January 26, 2021, at the office complex, defendant MARTINEZ-REYES gave a large white bag with the words "Happy Birthday"

on the side containing $226,600 of drug trafficking proceeds in U.S. currency to defendant JIAXUAN HE.

10.  On January 26, 2021, in Downey, California, defendant JIAXUAN HE possessed approximately $226,600 of drug trafficking proceeds in U.S. currency concealed inside a white paper bag, pictured below.





11.  On January 27, 2021, at Citibank ATMs in Downey and Long Beach, California, defendant BELANDRIA-CONTRERAS structured cash

deposits into his bank accounts to avoid a reporting requirement by conducting 24 separate transactions to deposit a total of $15,960 of drug trafficking proceeds in U.S. currency.

12.  On January 29, 2021, at a Citibank ATM in Long Beach, California, defendant ZAMBRANO structured cash deposits into his bank account to avoid a reporting requirement by conducting 15 separate transactions to deposit a total of $19,900 of drug trafficking proceeds in U.S. currency.

13.  On March 23, 2021, in Fontana, California, defendant CONTRERAS picked up a yellow plastic bag containing an unknown quantity of drug trafficking proceeds in U.S. currency from defendant BERNAL.

14.  On April 12, 2021, in Los Angeles, California, defendant OVALLE delivered an unknown quantity of drug trafficking proceeds in U.S. currency to defendant CONTRERAS.

15.  On April 21, 2021, defendants MARTINEZ-REYES and CONTRERAS delivered a Fruity Pebbles cereal box containing an unknown quantity of drug trafficking proceeds that later proved to be approximately $59,980 in U.S. currency to a residence used as a collection point and count house to further drug money laundering activity located at 11108 Freer Street, Temple City, California.

16.  On May 19, 2021, in South Gate, California, defendant OVALLE picked up approximately $183,030 of drug trafficking proceeds in U.S. currency from an unidentified co-conspirator.

17.  On May 27, 2021, in Pasadena, California, defendant GONZALEZ intentionally smashed his car into the official government vehicle driven by United States Drug Enforcement Administration Task Force Officer S.G., who was then trying to detain defendant GONZALEZ

as part of a drug trafficking investigation, in an attempt to obstruct the investigation and injure that task force officer.

18.   On May 27, 2021, in Pasadena, California, defendant GONZALEZ possessed 46 individually-wrapped packages of drug trafficking proceeds totaling approximately $598,110 in U.S. currency, pictured below.



19.   On July 12, 2021, in Anaheim, California, defendant CONTRERAS picked up an unknown quantity of drug trafficking proceeds in U.S. currency in a large black duffel bag from a co-conspirator.

20.   On July 12, 2021, in Temple City, California, defendant CONTRERAS delivered an unknown quantity of drug trafficking proceeds in U.S. currency to a money stash house operated by an unlicensed money exchange business located at 11108 Freer Street.

21.  On July 21, 2021, in El Monte, California, defendant MAYORGA delivered an unknown quantity of drug trafficking proceeds in U.S. currency to defendant CONTRERAS.

22.  On July 29, 2021, in Los Angeles, California, defendant LICON-ROBLES delivered an unknown amount of drug trafficking proceeds in U.S. currency to defendant CONTRERAS.

23.  On August 5, 2021, in Temple City, California, defendant CONTRERAS delivered an unknown amount of drug trafficking proceeds in U.S. currency to 11108 Freer Street.

24.  On August 18, 2021, in Temple City, California, defendant CONTRERAS delivered an unknown amount of drug trafficking proceeds in U.S. currency to 11108 Freer Street.

25.  On August 24, 2021, in Baldwin Park, California, defendant MAYORGA delivered approximately $249,500 of drug trafficking proceeds in U.S. currency to defendant MAUBERIS.

26.  On September 14, 2021, in Colton, California, defendant MAYORGA delivered approximately $99,350 of drug trafficking proceeds in U.S. currency to a co-conspirator who was to deliver the funds to Mexico.

27.  On December 3, 2021, in Los Angeles, California, defendant RODRIGUEZ-TRUJILLO picked up an unknown quantity of drug trafficking proceeds in U.S. currency from a co-conspirator.

28.  On December 16, 2021, in Lynwood, California, defendant RODRIGUEZ-TRUJILLO possessed approximately $379,660 of drug trafficking proceeds in U.S. currency, pictured below.



29.  On January 5, 2022, in Pomona, California, defendant MAYORGA possessed approximately $205,330 of drug trafficking proceeds in U.S. currency.

30.  On February 17, 2022, in Commerce, California, defendant MARTINEZ-REYES delivered approximately $124,800 of drug trafficking proceeds in U.S. currency to a co-conspirator known to the Grand Jury for the purpose of purchasing cryptocurrency on behalf of the drug trafficking organization that owned the proceeds.

31.  On May 11, 2022, in Arcadia, California, defendant MARTINEZ-REYES delivered an unknown amount of drug trafficking proceeds in U.S. currency to a co-conspirator known to the Grand Jury

for the purpose of purchasing cryptocurrency on behalf of the drug trafficking organization that owned the proceeds.

32. On October 18, 2022, in San Gabriel, California, defendant CABRERA delivered an unknown quantity of drug trafficking proceeds in U.S. currency to a co-conspirator.

33. On March 23, 2023, in San Gabriel, California, defendant ZHAO possessed approximately $111,430 of drug trafficking proceeds in U.S. currency concealed inside a white plastic bag.

34. On April 10, 2023, in Arcadia, California, defendant YE picked up an unknown quantity of drug trafficking proceeds in U.S. currency concealed inside a white plastic bag.

35. On April 10, 2023, in Arcadia, California, defendant YE picked up an unknown quantity of drug trafficking proceeds in U.S. currency concealed inside a yellow plastic bag.

36. On April 10, 2023, in North Hills, California, defendant YE delivered approximately $60,000 of drug trafficking proceeds in U.S. currency contained in white and yellow plastic bags to a U.S. currency customer.

37. On April 27, 2023, in Artesia, California, defendant YU deposited a cashier's check representing an unknown amount of United States currency at a Chase Bank ATM.

38. On April 27, 2023, in Artesia, California, defendant YU deposited approximately $100,000 of United States currency at a Chase Bank teller window.

39. On May 4, 2023, in La Verne, California, defendant YU possessed approximately $100,000 of drug trafficking proceeds in U.S. currency concealed inside a grey backpack.

40.   On May 4, 2023, in La Verne, California, defendant YANG possessed approximately $100,000 of drug trafficking proceeds in U.S. currency concealed inside a black plastic bag.

41.   On May 11, 2023, in Artesia, California, defendants SU and YU possessed approximately $50,000 of drug trafficking proceeds in U.S. currency concealed inside a brown satchel.

42.   On May 12, 2023, in San Gabriel, California, defendant ZHANG possessed approximately $150,000 of drug trafficking proceeds in U.S. currency, concealed inside a white plastic bag.

1                              COUNT TWO

2                        [18 U.S.C. § 1956(h)]

3                         [ALL DEFENDANTS]

4   A.   OBJECTS OF THE CONSPIRACY

5        Beginning in or about October 2019, and continuing until on or

6   about October 26, 2023, in Los Angeles, Ventura, and San Bernardino

7   Counties, within the Central District of California, and elsewhere,

8   defendants EDGAR JOEL MARTINEZ-REYES, PEIJI TONG, aka "PJ," aka "Dr.

9   P," aka "Po," SAI ZHANG, aka "Tommy," CHENGWU HE, aka "Ocean,"

10  BERNARDO MAUBERIS, PANYU ZHAO, RAUL CONTRERAS, aka "Batman,"

11  GUILLERMO ZAMBRANO, LUIS BELANDRIA-CONTRERAS, XUANYI MU, JIAYONG YU,

12  aka "Haoran Feng," XIAOLEI YE, SHOU YANG, aka "Chaoming Cheng," HANG

13  SU, OSCAR EDUARDO MAYORGA, DIEGO ACOSTA OVALLE, VICTOR RODRIGUEZ-

14  TRUJILLO, JIAXUAN HE, aka "Edward," VIDAL LICON-ROBLES, LEOPOLDO

15  BERNAL, DANIEL GONZALEZ, aka "Rafael Arocho," JULIO ALEXANDER

16  CABRERA, JOSE ANTONIO PARDO, and JIANDE ZHOU, and others known and

17  unknown to the Grand Jury, knowingly conspired and agreed with each

18  other to commit offenses against the United States, namely:

19       1.   To knowingly and intentionally conduct and attempt to

20  conduct financial transactions affecting interstate and foreign

21  commerce, knowing that the property involved in the financial

22  transactions represented the proceeds of some form of unlawful

23  activity, and which property was, in fact, the proceeds of a

24  specified unlawful activity, that is, the unlawful distribution of

25  controlled substances, in violation of Title 21, United States Code,

26  Section 841(a)(1), with the intent to promote the carrying on of said

27  specified unlawful activity, in violation of Title 18, United States

28  Code, Section 1956(a)(1)(A)(i); and

                                    26

2.    To knowingly and intentionally conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of a specified unlawful activity, that is, the unlawful distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

B.   <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED</u>

The objects of the conspiracy were to be accomplished, in substance, by the Means alleged in Count One, Section B of this First Superseding Indictment, which are re-alleged and incorporated by reference herein.

C.   <u>OVERT ACTS</u>

On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants MARTINEZ-REYES, TONG, SAI ZHANG, CHENGWU HE, MAUBERIS, ZHAO, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, MU, YU, YE, YANG, SU, MAYORGA, OVALLE, RODRIGUEZ-TRUJILLO, JIAXUAN HE, LICON-ROBLES, BERNAL, GONZALEZ, CABRERA, PARDO, and ZHOU committed the following overt acts, among others, within the Central District of California, and elsewhere:

The Overt Acts 1 through 42 alleged in Count One, Section C of this First Superseding Indictment are re-alleged and incorporated by reference herein.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)(II)]

[DEFENDANT BERNAL]

On or about March 25, 2021, in San Bernardino County, within the Central District of California, defendant LEOPOLDO BERNAL knowingly and intentionally possessed with intent to distribute at least 500 grams, that is, approximately 4,000 grams, of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, pictured below.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II)]

[DEFENDANT LICON-ROBLES]

On or about July 9, 2022, in Los Angeles County, within the Central District of California, defendant VIDAL EMILIO LICON-ROBLES knowingly and intentionally possessed with intent to distribute at least five kilograms, that is, approximately 30.1 kilograms, of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, pictured below.



COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ZHOU]

On or about July 26, 2022, in Los Angeles County, within the Central District of California, defendant JIANDE ZHOU knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 7.189 kilograms, of methamphetamine, a Schedule II controlled substance, pictured below.

1

2

3

4

5

6

7

8

9

10

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II); 18 U.S.C. § 2(a)]

[DEFENDANTS CABRERA and PARDO]

On or about October 18, 2022, in Los Angeles County, within the Central District of California, defendants JULIO ALEXANDER CABRERA and JOSE ANTONIO PARDO, each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute at least five kilograms, that is, approximately 50.6 kilograms, of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, pictured below.



1                                    COUNT SEVEN

2                       [18 U.S.C. §§ 371, 1960]

3                       [ALL DEFENDANTS]

4  A.   OBJECT OF THE CONSPIRACY

5       Beginning on a date unknown, but no later than January 2021, and

6  continuing to in or about October 2023, in Los Angeles, Ventura, and

7  San Bernardino Counties, within the Central District of California,

8  and elsewhere, defendants EDGAR JOEL MARTINEZ-REYES, PEIJI TONG, aka

9  "PJ," aka "Dr. P," aka "Po," SAI ZHANG, aka "Tommy," CHENGWU HE, aka

10  "Ocean," BERNARDO MAUBERIS, PANYU ZHAO, RAUL CONTRERAS, aka "Batman,"

11  GUILLERMO ZAMBRANO, LUIS BELANDRIA-CONTRERAS, XUANYI MU, JIAYONG YU,

12  aka "Haoran Feng," XIAOLEI YE, SHOU YANG, aka "Chaoming Cheng," HANG

13  SU, OSCAR EDUARDO MAYORGA, DIEGO ACOSTA OVALLE, VICTOR RODRIGUEZ-

14  TRUJILLO, JIAXUAN HE, aka "Edward," VIDAL LICON-ROBLES, LEOPOLDO

15  BERNAL, DANIEL GONZALEZ, aka "Rafael Arocho," JULIO ALEXANDER

16  CABRERA, JOSE ANTONIO PARDO, and JIANDE ZHOU, and others known and

17  unknown to the Grand Jury, conspired and agreed with each other to

18  knowingly and intentionally conduct, control, manage, supervise,

19  direct, and own an unlicensed money transmitting business affecting

20  interstate and foreign commerce, which failed to comply with the

21  money transmitting business registration requirements under Section

22  5330 of Title 31, United States Code, and the regulations thereunder,

23  all in violation of Title 18, United States Code, Sections 1960(a)

24  and 1960(b)(1)(B) and (C).

25  B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

26      ACCOMPLISHED

27       The object of the conspiracy was to be accomplished, in

28  substance, as follows:

The object of the conspiracy was to be accomplished, in substance, by the Means alleged in Count One, Section B of this First Superseding Indictment which are re-alleged and incorporated by reference herein.

C.   OVERT ACTS

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants MARTINEZ-REYES, TONG, SAI ZHANG, CHENGWU HE, MAUBERIS, ZHAO, CONTRERAS, ZAMBRANO, BELANDRIA-CONTRERAS, MU, YU, YE, SU, YANG, MAYORGA, OVALLE, RODRIGUEZ-TRUJILLO, JIAXUAN HE, LICON-ROBLES, BERNAL, GONZALEZ, CABRERA, PARDO, and ZHOU, and others known to the Grand Jury committed the following overt acts, among others, within the Central District of California, and elsewhere:

The Overt Acts 1 through 42 alleged in Count One, Section C of this First Superseding Indictment are re-alleged and incorporated by reference herein.

COUNT EIGHT

[31 U.S.C. §§ 5324(a)(3), (d)(2); 18 U.S.C. § 2(b)]

[DEFENDANT BELANDRIA-CONTRERAS]

On or about January 27, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant LUIS BELANDRIA-CONTRERAS knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured, assisted in structuring, and willfully caused to be structured, the following ATM deposits to a Citibank account ending in -1658 (the "Citibank account") with a domestic financial institution, namely, Citibank, and did so while violating another law of the United States, namely, Title 18, United States Code, Section 1956, and as part of a pattern of illegal activity involving more than $100,000 in a 12-month period:

| Location of Citibank ATM | Time | Amount of Cash Deposited |
|---|---|---|
| Downey, CA | 3:47 p.m. | $880 |
| Downey, CA | 3:48 p.m. | $680 |
| Downey, CA | 3:49 p.m. | $420 |
| Downey, CA | 3:50 p.m. | $820 |
| Downey, CA | 3:51 p.m. | $520 |
| Downey, CA | 3:51 p.m. | $640 |
| Downey, CA | 3:52 p.m. | $740 |
| Downey, CA | 3:53 p.m. | $400 |
| Downey, CA | 3:53 p.m. | $860 |
| Downey, CA | 3:54 p.m. | $840 |
| Downey, CA | 3:55 p.m. | $840 |
| Downey, CA | 3:56 p.m. | $320 |
| Long Beach, CA | 4:59 p.m. | $280 |
| Long Beach, CA | 4:59 p.m. | $780 |
| Long Beach, CA | 5:00 p.m. | $940 |
| Long Beach, CA | 5:01 p.m. | $900 |
| Long Beach, CA | 5:02 p.m. | $520 |
| Long Beach, CA | 5:02 p.m. | $580 |
| Long Beach, CA | 5:03 p.m. | $720 |
| Long Beach, CA | 5:04 p.m. | $520 |
| Long Beach, CA | 5:04 p.m. | $760 |
| Long Beach, CA | 5:05 p.m. | $820 |
| Long Beach, CA | 5:06 p.m. | $580 |
| Long Beach, CA | 5:06 p.m. | $600 |

**Total transactions: 24**
**Total amount deposited: $15,960**

A photograph of defendant BELANDRIA-CONTRERAS structuring into the Citibank account on January 27, 2021 is below.



COUNT NINE

[31 U.S.C. §§ 5324(a)(3), (d)(2); 18 U.S.C. § 2(b)]

[DEFENDANT ZAMBRANO]

On or about January 29, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant GUILLERMO ZAMBRANO knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured, assisted in structuring, and willfully caused to be structured, the following ATM deposits to a Citibank account ending in -0057 with a domestic financial institution, namely, Citibank, and did so while violating another law of the United States, namely, Title 18, United States Code, Section 1956, and as part of a pattern of illegal activity involving more than $100,000 in a 12-month period:

| Location of Citibank ATM | Time | Amount of Cash Deposited |
| --- | --- | --- |
| Long Beach, CA | 11:39 a.m. | $3,500 |
| Long Beach, CA | 11:40 a.m. | $2,300 |
| Long Beach, CA | 11:41 a.m. | $4,100 |
| Long Beach, CA | 11:42 a.m. | $780 |
| Long Beach, CA | 11:42 a.m. | $820 |
| Long Beach, CA | 11:43 a.m. | $860 |
| Long Beach, CA | 11:44 a.m. | $820 |
| Long Beach, CA | 11:45 a.m. | $880 |
| Long Beach, CA | 11:46 a.m. | $940 |
| Long Beach, CA | 11:47 a.m. | $880 |
| Long Beach, CA | 11:48 a.m. | $940 |
| Long Beach, CA | 11:50 a.m. | $800 |
| Long Beach, CA | 11:51 a.m. | $700 |
| Long Beach, CA | 11:51 a.m. | $720 |
| Long Beach, CA | 11:52 a.m. | $860 |

**Total transactions: 15**
**Total amount deposited: $19,900**

COUNT TEN

[18 U.S.C. § 111(a)(1), (b)]

[DEFENDANT GONZALEZ]

On or about May 27, 2021, in Los Angeles County, within the
Central District of California, defendant DANIEL GONZALEZ, also known
as "Rafael Arocho," intentionally and forcibly assaulted, resisted,
opposed, impeded, intimidated, and interfered with United States Drug
Enforcement Administration Task Force Officer S.G., while S.G. was
engaged in, and on the account of, the performance of his official
federal duties, and in so doing, used a deadly and dangerous weapon,
namely, a 2013 Lexus ES350 car, pictured below.



1      FORFEITURE ALLEGATION ONE

2      [21 U.S.C. § 853]

3      1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 21,

6   United States Code, Section 853, in the event of any defendant's

7   conviction of the offenses set forth in any of Counts One and Three

8   through Six of this First Superseding Indictment.

9      2.   Any defendant so convicted, shall forfeit to the United

10  States of America the following:

11         (a)   All right, title and interest in any and all property,

12  real or personal, constituting or derived from, any proceeds which

13  said defendant obtained, directly or indirectly, from any such

14  offense;

15         (b)   All right, title and interest in any and all property,

16  real or personal, used, or intended to be used, in any manner or

17  part, to commit, or to facilitate the commission of any such offense;

18  and

19         (c)   To the extent such property is not available for

20  forfeiture, a sum of money equal to the total value of the property

21  described in subparagraphs (a) and (b).

22     3.   Pursuant to Title 21, United States Code, Section 853(p),

23  any defendant so convicted shall forfeit substitute property if, by

24  any act or omission of said defendant, the property described in the

25  preceding paragraph, or any portion thereof: (a) cannot be located

26  upon the exercise of due diligence; (b) has been transferred, sold

27  to, or deposited with a third party; (c) has been placed beyond the

28  jurisdiction of the court; (d) has been substantially diminished in

1  value; or (e) has been commingled with other property that cannot be
2  divided without difficulty.

1

FORFEITURE ALLEGATION TWO

2

[18 U.S.C. § 982]

3      1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4 Procedure, notice is hereby given that the United States will seek

5 forfeiture as part of any sentence, pursuant to Title 18, United

6 States Code, Section 982(a)(1), in the event of any defendant's

7 conviction of the offense set forth in Count Two of this First

8 Superseding Indictment.

9      2.   Any defendant so convicted shall forfeit to the United

10 States of America the following:

11          (a)   Any property, real or personal, involved in such

12 offense, and any property traceable to such property; and

13          (b)   To the extent such property is not available for

14 forfeiture, a sum of money equal to the total value of the property

15 described in subparagraph (a).

16      3.   Pursuant to Title 21, United States Code, Section 853(p), as

17 incorporated by Title 18, United States Code, Section 982(b)(1), and

18 Title 18, United States Code, Section 982(b)(2), any defendant so

19 convicted shall forfeit substitute property, if, by any act or

20 omission of said defendant, the property described in the preceding

21 paragraph, or any portion thereof: (a) cannot be located upon the

22 exercise of due diligence; (b) has been transferred, sold to, or

23 deposited with a third party; (c) has been placed beyond the

24 jurisdiction of the court; (d) has been substantially diminished in

25 value; or (e) has been commingled with other property that cannot be

26 divided without difficulty. Substitution of assets shall not be

27 ordered, however, where the convicted defendant acted merely as an

28

1  intermediary who handled but did not retain the property in the
2  course of the money laundering offense unless the defendant, in
3  committing the offense or offenses giving rise to the forfeiture,
4  conducted three or more separate transactions involving a total of
5  $100,000.00 or more in any twelve-month period.

1

FORFEITURE ALLEGATION THREE

2

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3      1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 981(a)(1)(C) and Title 28, United States

7   Code, Section 2461(c), in the event of any defendant's conviction of

8   the offenses set forth in Count Seven of this Indictment.

9      2.   Any defendant so convicted shall forfeit to the United

10   States of America the following:

11          (a)   all right, title, and interest in any and all

12   property, real or personal, constituting, or derived from, any

13   proceeds traceable to the offenses; and

14          (b)   To the extent such property is not available for

15   forfeiture, a sum of money equal to the total value of the property

16   described in subparagraph (a).

17      3.   Pursuant to Title 21, United States Code, Section 853(p),

18   as incorporated by Title 28, United States Code, Section 2461(c), any

19   defendant so convicted shall forfeit substitute property, up to the

20   value of the property described in the preceding paragraph if, as the

21   result of any act or omission of said defendant, the property

22   described in the preceding paragraph or any portion thereof (a)

23   cannot be located upon the exercise of due diligence; (b) has been

24   transferred, sold to, or deposited with a third party; (c) has been

25   placed beyond the jurisdiction of the court; (d) has been

26   substantially diminished in value; or (e) has been commingled with

27   other property that cannot be divided without difficulty.

28

44

1

FORFEITURE ALLEGATION FOUR

2

[31 U.S.C. § 5317]

3    1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4 Procedure, notice is hereby given that the United States of America

5 will seek forfeiture as part of any sentence, pursuant to Title 31,

6 United States Code, Section 5317, in the event of any defendant's

7 conviction of the offenses set forth in either of Counts Eight or

8 Nine of this First Superseding Indictment.

9    2.   Any defendant so convicted shall forfeit to the United

10 States of America the following:

11        (a)   All property, real or personal, involved in the

12 offense and any property traceable thereto; and

13        (b)   To the extent that such property is not available for

14 forfeiture, a sum of money equal to the total value of the property

15 described in subparagraph (a).

16    3.   Pursuant to Title 21, United States Code, Section 853(p), as

17 incorporated by Title 31, United States Code, Section 5317(c)(1)(B),

18 any defendant so convicted shall forfeit substitute property, if, by

19 any act or omission of said defendant, the property described in the

20 preceding, or any portion thereof; (a) cannot be located upon the

21 exercise of due diligence; (b) has been transferred, sold to, or

22 deposited with a third party; (c) has been placed beyond the

23 jurisdiction of the court; (d) has been substantially diminished in

24 //

25 //

26 //

27 //

28

1  value; or (e) has been commingled with other property that cannot be

2  divided without difficulty.

3

4                                           A TRUE BILL

5

6                                            /s/
                                           _____
7                                          Foreperson

8  E. MARTIN ESTRADA
   United States Attorney
9

10

11  MACK E. JENKINS
    Assistant United States Attorney
12  Chief, Criminal Division

13  J. MARK CHILDS
    Assistant United States Attorney
14  Chief, International Narcotics,
    Money Laundering, and
15  Racketeering Section

16  JULIE J. SHEMITZ
    Assistant United States Attorney
17  International Narcotics, Money
    Laundering, and Racketeering
18  Section

19

20

21

22

23

24

25

26

27

28